1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   PRIETO AUTOMOTIVE, INC. et al.,          No.  1:21-cv-01085-KES-EPG

12              Plaintiffs,

13        v.                                   ORDER GRANTING DEFENDANTS'
                                               MOTIONS TO DISMISS WITH LEAVE TO
14   VOLVO CAR USA, LLC et al.,                AMEND

15              Defendants.                    (Doc. Nos. 36, 41)

16

17

18        This matter is before the court on two motions to dismiss, one filed by defendant Haron

19   Motor Sales, Inc., ("Haron"), (Doc. No 36), and the other filed by defendant Volvo Car USA,

20   LLC, ("Volvo").  (Doc. No. 41.)  On May 2, 2022, defendant Haron's motion was taken under

21   submission on the papers.  (Doc. No. 37.)  Defendant Volvo's motion was taken under

22   submission on the papers on May 16, 2022.  (Doc. No. 43.)  On March 14, 2024, this case was

23   reassigned to the undersigned.  (Doc. No. 75.)  For the reasons explained below, the court grants

24   both motions to dismiss, with leave to amend.

25                                   **BACKGROUND**

26        On July 12, 2021, plaintiffs Manuel Prieto, Ramona Llamas, and Prieto Automotive, Inc.,

27   initiated this action by filing a complaint against defendant Volvo, an automobile manufacturer,

28   and defendant Haron, a corporation that obtained a particular Volvo franchise that plaintiffs

                                        1

sought to acquire.  (Doc. No. 1.)  On April 8, 2022, the assigned magistrate judge granted the parties' joint stipulation to allow plaintiffs to file a first amended complaint ("FAC") adding plaintiffs' former attorney, Richard Aaron, as a defendant.  (Doc. Nos. 26, 27.)  On March 8, 2024, the claim against defendant Aaron was dismissed with prejudice by stipulation pursuant to Federal Rule of Civil Procedure 41.  (Doc. No. 74.)  The remaining claims in plaintiffs' FAC are a claim against Volvo for violation of 42 U.S.C. § 1981; and a claim against Haron for intentional interference with plaintiffs' contract with HAG Fresno, Inc., a California corporation doing business as Harris Volvo Cars Fresno ("HAG"), to purchase HAG's dealership.  (Doc. No. 28.)

As alleged in the FAC, Plaintiffs Prieto and Llamas own Prieto Automotive, which operates automobile dealerships in the greater Fresno area.[1]  (*Id.* at ¶ 9.)  "Plaintiffs are approved franchisees of many well-known automobile brands, including Mitsubishi, Mazda, Chevrolet, Buick, GMC, Ford and Subaru."  (*Id.*)  Prieto and Llamas are U.S. citizens born in Mexico and are of Hispanic descent.  (*Id.* at ¶ 8.)  They are "successful and proven dealership operators," and have helped invigorate formerly struggling dealerships including Sonora Ford, Subaru of Sonora, and Sanger Chevrolet Buick GMC.  (*Id.* at ¶ 10.)

In an effort to obtain a Volvo dealership, plaintiffs Prieto and Llamas executed an asset purchase agreement ("APA") with HAG on August 17, 2019.  (*Id.* at ¶ 11 & Ex. A (APA).)  The APA was between plaintiffs Prieto and Llamas, "or their permitted assignee," as the buyer, and HAG as the seller.  (*Id.* at 21.)  The APA authorized Prieto and Llamas to assign the buyer's rights under the agreement "to an assignee entity wholly-owned by" Prieto and Llamas, though it did not identify the entity by name.  (*Id.* at 36.)  Prieto and Llamas agreed to purchase various assets relating to HAG's business.  (*Id.* at 21–25.)  Under the APA, plaintiffs' obligation to buy was subject to the condition precedent that "all material, legally required approvals, licenses and consents be received" from Volvo; HAG's obligation to sell was not subject to this condition precedent.  (*Id.* at 30.)

///

---

[1]  The court presumes the factual allegations in the FAC to be true in evaluating the motions to dismiss.  *See Murguia v. Langdon*, 61 F.4th 1096, 1106 (9th Cir. 2023).

On August 19, 2019, plaintiffs submitted the executed APA to Volvo for approval. (*Id.* at ¶ 13.) The following day, plaintiffs sent Volvo a detailed business plan outlining how they planned to operate the dealership. (*Id.* at ¶ 14.) Volvo replied on September 13, 2019, informing plaintiffs that it did not approve of the sale and was exercising its right of first refusal to purchase the dealership on the same terms as outlined in the APA. (*Id.* at ¶ 15.) Volvo subsequently approved the transfer of the dealership to defendant Haron, a white-owned business. (*Id.*)

Plaintiffs allege that Volvo unlawfully discriminated against them on account of their race, ethnicity, and national origin by refusing to approve the APA and instead choosing "to contract with a less experienced white-owned operator, offering less desirable circumstances for the Volvo Dealership than Plaintiffs." (*Id.* at ¶¶ 7, 85, 86.) On September 20, 2019, plaintiffs sent a letter to Volvo asking it to reconsider. (*Id.* at ¶ 58.) In that letter, plaintiffs provided a layout for a new facility in north Fresno that they intended to use solely for the Volvo dealership. (*Id.* at ¶ 58.) On September 24, 2019, "Volvo responded to Plaintiffs' letter, stating nothing other than they were moving forward with another candidate." (*Id.* at ¶ 59.) Haron was the other candidate. (*Id.*)

Plaintiffs allege their proposed facility was highly trafficked, visible, and located near other dealerships, making it a more desirable location than Haron's isolated dealership in downtown Fresno, a primarily industrial area with light traffic. (*Id.* at ¶¶ 63, 64.) The FAC asserts that Haron placed the Volvo dealership in the same building as two other brands, providing less recognition than plaintiffs' proposed facility. (*Id.*) Further, plaintiffs allege that Haron "has less experience than Plaintiffs and only operates one dealership, whereas Plaintiffs have an extensive history of operating dealerships in the area and have earned a reputation for successfully operating multiple dealerships." (*Id.* at ¶ 65.) Plaintiffs allege that Volvo has a pattern and practice of refusing to do business with minority-owned dealership operators, that it has only one minority dealer in California, and that it would have approved the APA had plaintiffs been white. (*Id.* at ¶¶ 19, 84, 85.)

///

///

3

As to the claim against Haron, plaintiffs allege that Haron's tortious interference with the APA was made possible by the actions of plaintiffs' former attorney, Richard Aaron. (*See generally* Doc. No. 28.)  Specifically, plaintiffs allege that throughout the negotiation process, Aaron failed to disclose a conflict of interest in the form of a close personal relationship he had "with the owner of Haron, a competitor that was also interested in acquiring the dealership." (*Id.* at ¶ 37.)  Plaintiffs further allege that Aaron provided information to defendant Haron regarding their acquisition efforts to assist it in disrupting the APA. (*Id.*)  "Armed with the leaked information, Haron was able to present itself to Volvo as a white-owned alternative to Plaintiffs, willing to execute an APA on the same terms as them." (*Id.* at ¶ 24.)

Plaintiffs allege they learned of this conflict in email communications between seller HAG and the escrow company involved in the sale of the dealership, in which HAG stated it was aware that Aaron was representing both plaintiffs and Haron. (*Id.* at ¶ 70.)  Plaintiffs allege that Aaron worked with Haron to assist it in interfering with the APA and "usurping the Volvo Dealership." (*Id.* at ¶ 71.)  When plaintiffs spoke with Aaron about this conflict, he denied representing Haron but informed plaintiffs that he could no longer represent them with respect to Volvo. (*Id.* at ¶¶ 68, 69.)

On April 29 and May 13, 2022, Haron and Volvo, respectively, filed their pending motions to dismiss the FAC pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. Nos. 36, 41.)  Plaintiffs filed oppositions to both motions on May 27, 2022. (Doc. Nos. 45, 46.)  On June 6, 2022, Haron and Volvo filed their respective replies. (Doc. Nos. 48, 49.)

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

1  the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v.*

2  *Iqbal*, 556 U.S. 662, 678 (2009).

3       In determining whether a complaint states a claim on which relief may be granted, the

4  court accepts as true the allegations in the complaint and construes the allegations in the light

5  most favorable to the plaintiff.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  However,

6  the court need not assume the truth of legal conclusions cast in the form of factual allegations.

7  *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986).  While Rule 8(a) does not

8  require detailed factual allegations, "it demands more than an unadorned, the-defendant-

9  unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  A pleading is insufficient if it offers

10  mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."

11  *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements

12  of a cause of action, supported by mere conclusory statements, do not suffice.").  Moreover, it is

13  inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the

14  defendants have violated the . . . laws in ways that have not been alleged."  *Associated Gen.*

15  *Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

16       In ruling on a motion to dismiss brought under Rule 12(b)(6), the court is permitted to

17  consider material that is properly submitted as part of the complaint.  *Lee v. City of Los Angeles*,

18  250 F.3d 668, 688–89 (9th Cir. 2001).  Here, plaintiffs attach the APA as Exhibit A to the FAC

19  (Doc. 28 at 20–41).  Accordingly, the analysis below considers both the FAC's allegations and

20  the terms of the executed APA.

21  **ANALYSIS**

22  **A.**    **Defendant Volvo's Motion to Dismiss**

23       Defendant Volvo has moved to dismiss plaintiffs' 42 U.S.C. § 1981 claim.  (Doc. No. 41.)

24  The text of § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall

25  have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed

26  by white citizens."  42 U.S.C. § 1981(a).  The statute defines the term "make and enforce

27  contracts" to include "the making, performance, modification, and termination of contracts, and

28  the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

42 U.S.C. § 1981(b).  A plaintiff asserting a § 1981 claim "must initially identify an impaired 'contractual relationship,' § 1981(b), under which the plaintiff has rights."  *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)).  A plaintiff "must [also] show intentional discrimination on account of race."  *Evans v. McKay*, 869 F.2d 1341, 1344 (9th Cir. 1989); *see also Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982) (holding that § 1981 can be violated only by purposeful discrimination).  Moreover, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).

As a preliminary matter, the parties disagree as to the appropriate test under which to evaluate the plausibility of plaintiffs' claim for purposes of the motion to dismiss.  Plaintiffs urge the court to apply the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as adapted to § 1981 claims by the Ninth Circuit in *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138 (9th Cir. 2006).[2]  (Doc. No. 46 at 14–15.)  Under this test, plaintiffs argue they have satisfied their initial burden by plausibly alleging that:  (1) they are members of a protected class, (2) they attempted to contract for certain services, (3) they were denied the right to contract for those services, and (4) that such services remained available to similarly situated individuals who were not members of plaintiffs' protected class.  Plaintiffs also argue that Volvo failed to meet its burden of identifying a non-discriminatory reason for its adverse action.  (*Id.* at 16–23.)

Volvo argues that the Supreme Court's decision in *Comcast* forecloses application of the *McDonnell Douglas* framework on this motion to dismiss.  (Doc. Nos. 41-1 at 10 n.2; 49 at 8–11.)  In *Comcast* the Supreme Court considered the element of causation for claims brought under

---

[2]  In *Lindsey*, in evaluating a motion for summary judgment, the Ninth Circuit adapted elements of the *McDonnell Douglas* framework, which was "established in the [Title VII] employment discrimination context[,] to claims of racial discrimination in non-employment contracts arising under 42 U.S.C. § 1981."  *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1145 (9th Cir. 2006).  "Under *McDonnell Douglas*, if the plaintiff satisfies the initial burden of establishing a *prima facie* case of racial discrimination, the burden shifts to the defendant to prove it had a legitimate non-discriminatory reason for the adverse action.  If the defendant meets that burden, the plaintiff must prove that such a reason was merely a pretext for intentional discrimination."  *Lindsey*, 447 F.3d at 1144 (internal citation and footnote omitted).

42 U.S.C. § 1981.  *Comcast*, 589 U.S. at 331.  The Court held that, to establish a claim under § 1981, a plaintiff had to plead and prove that the discrimination was the but-for cause of the plaintiff's injury.  *Id.* at 331, 340.  The Court also addressed whether the *McDonnell Douglas* burden shifting framework applied in the context of a motion to dismiss a § 1981 claim.  *Id.* at 340.  The Court noted that *McDonnell Douglas* is best utilized as "a tool for assessing claims, typically at summary judgment, when the plaintiff relies on indirect proof of discrimination."  *Id.* at 340.  The Court held that "[w]hether or not *McDonnell Douglas* has some useful role to play in § 1981 cases," that decision "can provide no basis for allowing a complaint to survive a motion to dismiss when it fails to allege essential elements of a plaintiff's claim."  *Id.* at 340–41.

The Ninth Circuit has held that the prima facie elements and evidentiary burden shifting of *McDonnell Douglas* do not apply when evaluating motions to dismiss § 1981 claims.  *Maduka v. Sunrise Hosp.*, 375 F.3d 909, 912–13 (9th Cir. 2004).  A plaintiff's complaint asserting a § 1981 violation "must contain only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Maduka*, 375 F.3d at 912 (citing and quoting *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 508 (2002), and Fed. R. Civ. P. 8(a)(2)).  The elements plaintiffs must allege to state a § 1981 claim are:  "(1) plaintiff is a member of a racial minority, (2) defendant intentionally discriminated against plaintiff because of his or her race, and (3) the discrimination involved the making or enforcing of a contract."  *Allen v. U.S. Bancorp*, 264 F. Supp. 2d 945, 948 (D. Ore. 2003).

Volvo does not dispute that plaintiffs satisfy the first element as members of a racial minority.  *See Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 850 (9th Cir. 2004) (noting that, for purposes of § 1981, race has been defined broadly to cover immigrant ethnic groups).  Volvo also does not dispute the sufficiency of the allegations as to the third element regarding the making or enforcing of a contract.  The issues in dispute on Volvo's motion are whether the FAC plausibly alleges Volvo intentionally discriminated against plaintiffs based on their race and national origin, and whether plaintiffs have sufficiently alleged such discrimination was the but-for cause of their failure to obtain the Volvo franchise.  The court initially considers below Volvo's argument that plaintiffs Manuel Prieto and Ramona Llamas lack standing to

1   pursue this claim.  (*See* Doc. No. 41-1 at 17.)

2        1.    Standing

3        Volvo argues that plaintiffs Prieto and Llamas lack standing because they "clearly

4   intended for Prieto Automotive, not Prieto and Llamas, to acquire the Volvo Dealership and

5   contract directly with Volvo."  (Doc. No. 41-1 at 17–18.)  Volvo argues that allowing Prieto,

6   Llamas, and Prieto Automotive to all bring suit in this action would violate fundamental

7   principles of corporation and agency law, relying on the Supreme Court's decision in *Domino's*

8   *Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006).  (Doc. No. 49 at 20.)

9        In *Domino's Pizza*, the Court held that a claim brought under § 1981 "must initially

10  identify an impaired 'contractual relationship,' § 1981(b), under which the plaintiff has rights."

11  *Domino's Pizza*, 546 U.S. at 476.  In that case, the sole shareholder/president of a corporation

12  sued Domino's Pizza.  *Id.*  The Court reasoned that the plaintiff could not bring suit because the

13  contractual relationship identified in his complaint was between Domino's and the corporation.

14  *Id.* at 477.  The Court noted that the corporate form and rules of agency had protected the plaintiff

15  in a prior bankruptcy proceeding involving the corporation, even though he "negotiated, signed,

16  performed, and sought to enforce contracts for" the company.  *Id.* (internal quotation marks

17  omitted).  By the same token, the corporate form and rules of agency confirmed that the plaintiff

18  did not have rights to sue under the contracts between the corporation and Domino's Pizza.  *Id.*

19       In this case, Prieto and Llamas signed the APA in their individual capacities.  (Doc. 28 at

20  39.)  They clearly had rights under the APA as signatories, unlike the plaintiff in *Domino's Pizza*,

21  whose corporation was the contracting party.  *See Domino's Pizza*, 546 U.S. at 477.

22       The APA also provides that "[a]fter delivery to Escrow Holder of the Initial Deposit, and

23  with written notice to Seller, Buyer may assign its rights under this Agreement to an assignee

24  entity wholly-owned by Manuel Prieto and Mona R. Llamas ('Assignee')."  (Doc. 28 at 36.)  The

25  FAC alleges that the entity referenced in the above provision was Prieto Automotive.  (*Id.* at ¶

26  42.)  The FAC sufficiently establishes for purposes of this motion to dismiss that Prieto

27  Automotive was an intended third-party beneficiary of the contract, or the intended assignee, and,

28  therefore, has standing as well to bring this claim.  *See Applera Corp. v. MP Biomedicals, LLC*,

1   173 Cal. App. 4th 769, 786 (2009) (assignee had standing to sue for breach of contract); *Schauer*

2   *v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949, 957 (2005) (third-party beneficiary had

3   standing in her own right to sue for breach of contract); *GECCMC 2005-C1 Plummer St. Off. Ltd.*

4   *P'ship v. JPMorgan Chase Bank, Nat. Ass'n*, 671 F.3d 1027, 1033 (9th Cir. 2012) (elements

5   required to prove intended beneficiary status).[3]

6        For these reasons, the court finds plaintiffs Prieto and Llamas have standing to pursue

7   their claim against Volvo, and Volvo's motion to dismiss on this ground is denied.

8        2.    Intentional Discrimination

9        Volvo argues the FAC does not plausibly allege that it knew plaintiffs were Hispanic, and

10   even if it did, the FAC does not sufficiently allege discriminatory intent.  (Doc. Nos. 41-1 at 12–

11   14; 49 at 13–16.)  The FAC alleges plaintiffs contacted and received responses from Volvo on

12   two occasions:  (1) when they sent a detailed business plan along with the APA to Volvo for

13   approval, and (2) when, after Volvo rejected their plan, they sent a request for reconsideration

14   along with the layout for their new facility.  (Doc. No. 28 at ¶¶ 53–59.)  Plaintiffs allege that

15   "[b]ased on their identifiably Hispanic names, Volvo was aware that they were Hispanic."  (*Id.* at

16   ¶ 8.)  Volvo argues that the FAC inappropriately concludes that Volvo knew plaintiffs' race

17   solely from their names.  (Doc. Nos. 41-1 at 13; 49 at 14–15.)  However, the FAC also alleges

18   that "Prieto Auto is a 100% Hispanic-owned company" and that "Plaintiffs have an extensive

19   history of operating dealerships in the area and have earned a reputation for successfully

20

21   [3]  In *Domino's Pizza*, the Court referred to a contractual relationship "under which the plaintiff
has rights" rather than "to which the plaintiff is a party."  *Domino's Pizza*, 546 U.S. at 476 n.3.

22   The Court explained that its phrasing was purposeful, so as not to exclude or affirm "the
possibility that a third-party intended beneficiary of a contract may have rights under § 1981."  *Id.*

23   Here, the APA's provisions along with the allegations in the FAC sufficiently allege that Prieto
and Llamas were permitted, and in fact intended, to assign their rights under the APA to Prieto

24   Automotive.  (Doc. No. 28 at ¶ 42.)  Under California law, "[a] third party qualifies as a
beneficiary under a contract if the parties intended to benefit the third party and the terms of the

25   contract make that intent evident."  *Balsam v. Tucows Inc.*, 627 F.3d 1158, 1161 (9th Cir. 2010)
(citing *Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d 819, 821–22 (9th Cir. 1985).  The

26   "third party need not be expressly named or identified in [the] contract," so long as the party
demonstrates "that it is a member of a class of persons for whose benefit it was made."  *Balsam*,

27   627 F.3d at 1161 (citing *Spinks v. Equity Residential Briarwood Apts.*, 171 Cal. App. 4th 1004

28   (2009)).

1   operating multiple dealerships." (*Id.* at ¶¶ 65, 80.)

2        Where the parties present two alternative explanations, both of which are plausible,

3   plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). *Starr v. Baca*, 652 F.3d

4   1202, 1216 (9th Cir. 2011). "When considering plausibility, courts must also consider an

5   'obvious alternative explanation' for [the] defendant's behavior." *Eclectic Properties E., LLC v.*

6   *Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S.

7   662, 682 (2009)). "Plaintiff's complaint may be dismissed only when defendant's plausible

8   alternative explanation is so convincing that plaintiff's explanation is *im* plausible." *Starr*, 652

9   F.3d at 1216 (emphasis in original). However, "[w]hen faced with two *possible* explanations,

10  only one of which can be true and only one of which results in liability, plaintiffs cannot offer

11  allegations that are 'merely consistent with' their favored explanation but are also consistent with

12  the alternative explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th

13  Cir. 2013) (emphasis added) (quoting *Iqbal*, 556 U.S. at 678). "Something more is needed, such

14  as facts tending to exclude the possibility that the alternative explanation is true, in order to render

15  plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *Id.* (citing *Bell Atl.*

16  *Corp. v. Twombly*, 550 U.S. 544, 554 (2007)).

17       Viewing the allegations in the light most favorable to plaintiffs, it is plausible defendant

18  Volvo knew that plaintiffs were Hispanic based on based on plaintiffs' names and the fact that

19  they were known dealership operators with an extensive history of dealership operations and a

20  reputation in the area.[4] "Names are often a proxy for race and ethnicity." *El-Hakem v. BJY Inc.*,

21  415 F.3d 1068, 1073 (9th Cir. 2005); *see also Orhorhaghe v. INS*, 38 F.3d 488, 498 (9th Cir.

---

22  [4]  Volvo relies on *In re Century* in arguing that the FAC is not sufficiently specific as to Volvo's

23  knowledge that plaintiffs were Hispanic. (Doc. No. 49 at 14–15.)  This argument fails to consider
    that "[t]he level of factual specificity needed to satisfy [*Iqbal* and *Twombly*] will vary depending

24  on the context." *In re Century*, 729 F.3d at 1107 (citing *Robbins v. Oklahoma*, 519 U.S. 1242,
    1248 (10th Cir. 2008)).  In *In re Century*, the Ninth Circuit concluded that "a greater level of

25  factual specificity will be needed" in a securities case when considering "whether plaintiffs have
    adequately alleged that their shares are traceable," when the defendant company had "issued

26  shares in multiple offerings under more than one registration statement." *In re Century*, 729 F.3d
    at 1107.  By comparison, this matter is significantly less complex:  the issue is whether plaintiffs

27  have plausibly alleged that Volvo was aware they were Hispanic.  There is no basis to require a
    greater level of factual specificity beyond that required under *Iqbal* and *Twombly*.

28

1  1994) (recognizing that "discrimination against people who possess surnames identified with

2  particular racial or national groups is discrimination on the basis of race or national origin").

3       Assuming the FAC's allegations to be true, plaintiffs represent a wholly Hispanic-owned

4  company operating multiple dealerships in the area, with a reputation for success; they

5  communicated directly with defendant Volvo to try to obtain the Volvo franchise; and their

6  names provided some indication of their Hispanic identity.  (Doc. No. 28 at ¶¶ 8, 53–59, 65, 80.)

7  Plaintiffs' allegations tend to exclude the possibility that Volvo was unaware that plaintiffs were

8  Hispanic.  *See Iqbal*, 556 U.S. at 664.  Based on the FAC's allegations, it is plausible that

9  defendant Volvo knew, or at least assumed, that plaintiffs were Hispanic when it considered them

10  as potential franchisees.

11       However, mere knowledge of race or national origin coupled with conclusory allegations

12  of a defendant's discriminatory animus is insufficient to survive a motion to dismiss.  *Wade v.*

13  *U.S Bank Nat'l Ass'n*, No. cv 19-10044-JFW(JEMx), 2020 WL 5045311, at *2 (C.D. Cal. July 6,

14  2020).   Plaintiffs fail to allege sufficient facts to plausibly establish Volvo's discriminatory

15  intent.  The Ninth Circuit has recognized that the same legal principles apply in § 1981 cases as in

16  Title VII disparate treatment cases.  *See Surrell v. California Water Serv. Co.*, 518 F.3d 1097,

17  1103 (9th Cir. 2008).  A plaintiff may prove his case using direct or circumstantial evidence.

18  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003) (Title VII case).[5]  The Supreme Court has

19  explained that "[t]he reason for treating circumstantial and direct evidence alike is both clear and

20  deep rooted:  'Circumstantial evidence is not only sufficient, but may also be more certain,

21

22  _____

[5]  The Supreme Court held in *Desert Palace* that, in a mixed motive case under Title VII, a
plaintiff may use circumstantial evidence to prove discrimination was a motivating factor in the

23  employment decision.  *Desert Palace*, 539 U.S. at 101–02.  The court is unpersuaded by Volvo's
argument that because the Supreme Court in *Comcast* rejected an application of the motivating

24  factor test to § 1981 claims, the use of circumstantial evidence countenanced in *Desert Palace* is
inapplicable in § 1981 cases.  (Doc. No. 49 at 12.)  *Comcast* did not preclude a plaintiff from

25  relying on circumstantial evidence to establish the essential elements of a § 1981 claim; rather, it
held that "a plaintiff bears the burden of showing that race was a but-for cause of its injury."

26  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020).  In other
words, *Comcast* considered the appropriate causation standard, not the kind of evidence that

27  could be used to establish a claim.  *Id.*  A plaintiff may rely on circumstantial evidence to
establish a defendant's discriminatory intent on a § 1981 claim.  *See Surrell*, 518 F.3d at 1105.

28

1   satisfying and persuasive than direct evidence.'" *Id.* at 100 (quoting *Rogers v. Missouri Pac. R.*

2   *Co.*, 352 U.S. 500, 508 n.17 (1957)).  "Although 'naked allegations' of discriminatory intent are

3   too conclusory to survive a motion to dismiss, discriminatory motive may be – and commonly is

4   – demonstrated by circumstantial evidence." *Body by Cook, Inc. v. State Farm Mut. Ins. Co.*, 869

5   F.3d 381, 386 (5th Cir. 2017).

6          The FAC attempts to establish the element of intentional discrimination circumstantially.

7   Plaintiffs allege they "are in good standing with Ford, Subaru, Chevrolet, Buick, GMC and

8   Mazda, and they have never been rejected by any new car brand until Volvo."  (Doc. No. 28 at

9   ¶ 21.)  Plaintiffs also allege "Volvo has never indicated to Plaintiffs that there was any issue with

10  the APA, Plaintiffs' business plan, their operations at other dealerships or any concerns relating to

11  their purchase of the Volvo Dealership."  (*Id.* at ¶ 56.)  The FAC alleges that "Volvo contracted

12  with Haron under the exact same terms as the APA submitted by Plaintiffs."  (*Id.* at ¶ 82.)  The

13  FAC further alleges that "Volvo lacks [] minority dealer representation.  In fact, Volvo has only

14  one minority dealer in all of California."  (*Id.* at ¶ 19.)  Plaintiffs also allege that their experience

15  and planned operation of the Volvo dealership was more desirable in a franchisee than Haron's

16  experience and operation.  (*Id.* at ¶¶ 58, 60–65.)

17         While plaintiffs may plead discriminatory intent based on circumstantial evidence, the

18  FAC's allegations fall short of satisfying the plausibility standard for several reasons.  First,

19  plaintiffs' allegation that defendant Volvo has only one minority dealer in California is markedly

20  different from the robust "statistical evidence" of discrimination evaluated in *Gay v. Waiters' &*

21  *Dairy Lunchmen's Union, Loc. No. 30*, 489 F. Supp. 282, 300 (N.D. Cal. 1980), *aff'd*, 694 F.2d

22  531 (9th Cir. 1982), a case upon which plaintiffs rely.  (Doc. No. 46 at 20.)  Even drawing all

23  reasonable inferences in favor of plaintiffs, the single data point offered here does not make it

24  plausible that defendant Volvo declined to approve the APA because plaintiffs were Hispanic.

25         Second, plaintiffs' reliance on the unpublished cases *James v. U.S. Bancorp*, 816 F. App'x

26  181, 182 (9th Cir. 2020) and *Harrison v. Whole Foods Mkt.*, 854 F. App'x 124 (9th Cir. 2021),

27  which reversed dismissals of § 1981 claims for failure to state a claim, is misplaced.  (Doc. No.

28  46 at 17.)  These unpublished cases provide little information on the specific allegations in the

1  underlying complaints.  Moreover, they concern allegations of disparate treatment of customers

2  based on race in personal interactions in retail settings, which would tend to reflect substantially

3  more interaction between the defendants and the plaintiffs, and between the defendants and

4  similarly situated customers of another race, than the limited written interactions between

5  plaintiffs and Volvo alleged in the FAC.  There is no support for plaintiffs' characterization of the

6  allegations in *James* and *Harrison* as "weaker than the allegations in the FAC" (Doc. No. 46 at

7  17), and these decisions fail to support plaintiff's argument.[6]

8         Third, plaintiffs' allegation that Volvo assigned the dealership to Haron on the same terms

9  as in the APA does not plausibly establish intentional discrimination, because Volvo was required

10  under California law to at least match the terms of the APA when electing its right of first refusal.

11  California Vehicle Code § 11713.3(t)(5) provides:

12       Upon the franchisor's exercise of the right of first refusal, the
         consideration paid by the franchisor to the franchisee and owners of
13       the franchised business shall equal or exceed all consideration that
         each of them were to have received under the terms of, or in
14       connection with, the proposed sale, assignment, or transfer, and the
         franchisor shall comply with all the terms and conditions of the
15       agreement or agreements to sell, transfer, or assign the franchised
         business.
16

17  Cal. Veh. Code § 11713.3(t)(5).  California law required defendant Volvo to (1) match or exceed

18  the consideration seller HAG would have received under the APA and, (2) "comply with all the

19  terms and conditions of the agreement or agreements to sell, transfer, or assign the franchised

20  business."  *Id.*  Without more, Volvo's assignment of the dealership to Haron on the same terms

21  as set out in the APA appears to simply reflect that Volvo was required to acquire the dealership

22  on those terms when it exercised its right of first refusal, and it then passed the dealership to

23  Haron on those terms.

24         Fourth, plaintiffs fail to plausibly allege that defendant Haron was a less qualified

25  applicant for the Volvo dealership.  Critically, the FAC does not allege Volvo's criteria or

26  standards for the approval of new franchisees.  *See* Cal. Bus. & Prof. Code § 20029.  The

27  ──────────────
28  [6] Both cases also involved a review of pro se complaints, which are more liberally construed.
    *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

1    allegations that Haron owned fewer dealerships, and that plaintiffs' proposed facility would have

2    been dedicated solely to Volvo, unlike Haron's facility, could conceivably be consistent with

3    plaintiffs' conclusion that Haron was less qualified.  But it is also possible, consistent with the

4    FAC's allegations, that Volvo found Haron more qualified given these circumstances or

5    considered other factors under which Haron was more qualified.  The FAC fails to exclude

6    alternative, non-discriminatory possibilities.  *See In re Century*, 729 F.3d at 1108.  For example, it

7    would be consistent with the FAC that Volvo considered Haron's ownership of fewer dealerships

8    in a positive light, rather than a negative light.

9        Volvo also argues that the FAC's allegations against plaintiffs' former attorney render the

10   allegations against Volvo implausible, because "Aaron's betrayal, not Volvo's alleged

11   discrimination, was the but-for cause of Plaintiffs' alleged harm."  (Doc. Nos. 41-1 at 12; 49 at

12   13.)  This argument misses the point that "[o]ften, events have multiple but-for causes."  *Bostock*

13   *v. Clayton Cnty.*, 590 U.S. 644, 656 (2020).  In *Bostock*, a Title VII disparate treatment case, the

14   Supreme Court held that "a defendant cannot avoid liability just by citing some *other* factor that

15   contributed to its challenged employment decision.  So long as the plaintiff's sex was one but-for

16   cause of that decision, that is enough to trigger the law."  *Id.*  This rationale applies equally to the

17   present case.  *See Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008)

18   ("When analyzing § 1981 claims, we apply the same legal principles as those applicable in a Title

19   VII disparate treatment case.").

20       The FAC alleges that "Volvo rejected Prieto and Llamas because they are Hispanic and

21   awarded the Volvo Dealership to a white dealer."  (Doc. No. 28 at ¶ 22.)  It also alleges that, "[i]f

22   Plaintiffs were white, Volvo would have approved Plaintiffs' APA to purchase the Dealership."

23   (*Id.* at ¶ 85.)  These allegations are conclusory, and, as addressed above, plaintiffs have failed to

24   plausibly allege facts sufficient to establish Volvo's intentional discrimination.  Plaintiffs have

25   therefore also failed to plausibly allege that such discrimination was the but for cause of their

26   injury.  However, if plaintiffs can plausibly allege Volvo's intentional discrimination in an

27   amended complaint, the fact that there may be multiple "but for" causes of plaintiffs' injury,

28   including defendant Aaron's conduct, would not necessarily preclude Volvo's conduct from also

1   being a but for cause of the injury.

2        For these reasons, plaintiffs have failed to plausibly allege that Volvo intentionally

3   discriminated against them based on race.  The court grants Volvo's motion to dismiss, with leave

4   to amend to cure the deficiencies identified in the FAC as to the § 1981 claim.  *United Data*

5   *Servs., LLC v. Fed Trade Comm'n*, 39 F.4th 1200, 1208 (9th Cir. 2022) (leave to amend should

6   be given if amendment could cure pleading defect).

7   **B.**    **Defendant Haron's Motion to Dismiss**

8        Defendant Haron moves to dismiss the FAC's claim of intentional interference with

9   plaintiffs' APA contract to acquire HAG's dealership assets.  (Doc. No. 36.)  The FAC does not

10   allege that Haron interfered with HAG's performance of the APA or caused HAG to break off the

11   APA.  Nor do plaintiffs allege that they had any contractual agreement with Volvo or that Haron

12   interfered with any such contract with Volvo.  Rather, the FAC alleges that Haron caused Volvo,

13   which is not a party to the APA, to withhold consent to the transfer of the Volvo franchise to

14   plaintiffs, thereby causing *plaintiffs* not to proceed with the APA.

15        "Under California law, the elements for the tort of intentional interference with

16   contractual relations are '(1) a valid contract between plaintiff and a third party; (2) defendant's

17   knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or

18   disruption of the contractual relationship; (4) actual breach or disruption of the contractual

19   relationship; and (5) resulting damage.'"  *United Nat. Maint., Inc. v. San Diego Convention Ctr.,*

20   *Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014) (quoting *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,

21   50 Cal. 3d 1118, 1126 (1990)).  In contrast to the separate tort of intentional interference with

22   prospective economic advantage, under a tortious interference with contract claim, "[i]t is

23   generally not necessary that the defendant's conduct be wrongful apart from the interference with

24   the contract itself."  *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141, 1142 (2020).

25        Haron's motion raises three arguments:  First, Haron did not interfere with plaintiffs'

26   purchase of a Volvo franchise, because plaintiffs never had any such contractual right; Second,

27   plaintiffs have alleged no facts showing that Haron caused Volvo not to grant them the franchise;

28   Third, Prieto Automotive, Inc., is not a proper plaintiff.  (Doc. No. 36-1 at 12–21.)  The court first

addresses whether Prieto Automotive, Inc. is a proper plaintiff, before turning to the other two arguments.

### 1.    Whether Prieto Automotive, Inc., is a Proper Plaintiff

Haron argues that "Prieto Automotive is not a real party in interest, and any claims alleged by it should be dismissed from this case." (Doc. No. 36-1 at 21.)  Haron contends that because Prieto Automotive was not identified in the APA, it is neither a party to, nor an express beneficiary of, that contract.  (*Id.* at 20.)  Plaintiffs reject this argument and assert that "Prieto Auto was contemplated as a party 'entering into' the APA and is a third-party beneficiary."  (Doc. No. 45 at 27.)

Under California law, "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."  Cal. Civ. Code § 1559.  "A third party qualifies as a beneficiary under a contract if the parties intended to benefit the third party and the terms of the contract make that intent evident."  *Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d 819, 821–22 (9th Cir. 1985)  (citing *Strauss v. Summerhays*, 157 Cal. App. 3d 806, 816 (Ct. App. 1984)).  "California law recognizes that third-party beneficiaries may seek to enforce an agreement if they are within the class of persons intended to be benefited by that agreement."  *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prod. Liab. Litig.*, 975 F.3d 770, 776 (9th Cir. 2020) (citing *Gen. Motors Corp. v. Superior Ct.*, 12 Cal. App. 4th 435, 444 (1993)); *see also Balsam v. Tucows Inc.*, 627 F.3d 1158, 1161 (9th Cir. 2010) (noting a third party need not be expressly named or identified in a contract to be a third-party beneficiary).

"Whether the third party is an intended beneficiary . . . involves construction of the intention of the parties, gathered from reading the contract as a whole in light of the circumstances under which it was entered."  *Balsam*, 627 F.3d at 1161 (quoting *Prouty v. Gores Tech. Grp.*, 121 Cal. App. 4th 1225, 1233 (2004)).  "Insofar as intent to benefit a third person is important in determining his right to bring an action under a contract, it is sufficient that the promisor must have understood that the promisee had such intent.  No specific manifestation by the promisor of an intent to benefit the third person is required."  *Lucas v. Hamm*, 56 Cal. 2d 583, 591 (1961) (internal citations omitted).

16

*Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949 (2005), is instructive on this issue.  In *Schauer*, the plaintiff and her husband sought to purchase an engagement ring. *Schauer*, 125 Cal. App. 4th at 953.  Both the plaintiff and her husband were present when the plaintiff selected a ring from the defendant jeweler and the plaintiff's husband purchased it.  *Id.* at 958.  The plaintiff subsequently discovered that the ring was worth much less than her husband had paid for it.  *Id.* at 953.  The plaintiff sued the jeweler under several theories, including breach of contract as a third-party beneficiary.  *Id.* at 953–54.  The trial court sustained the jeweler's demurrer and dismissed the claim.  *Id.* at 955.  The California Court of Appeal concluded that the plaintiff could enforce the contract as a third party beneficiary even though she was never assigned or transferred rights under the contract.  *Id.* at 957.  Because the plaintiff and her husband were both present during the purchase, and her husband purchased the ring for the stated purpose of giving it to the plaintiff, the court reasoned that the defendant jeweler "*must* have understood [the husband's] intent to enter the sales contract for plaintiff's benefit."  *Id.* at 958. Accordingly, the court held that the plaintiff adequately pled her status as a third-party beneficiary and could proceed on her contract claim.  *Id.*

In this case, Prieto Automotive is a third-party beneficiary of the APA.  The APA provided Prieto and Llamas with the power to assign their rights to their wholly owned business entity.  The FAC sufficiently alleges that the business entity was understood to be Prieto Automotive.  The preamble of the APA states:

> THIS ASSET PURCHASE AGREEMENT (the "Agreement") is entered into by and between MANUEL PRIETO AND RAMONA R. LLAMAS, *or their permitted assignee as provided herein,* ("Buyer"), and HAG FRESNO, INC., a California corporation dba HARRIS VOLVO CARS FRESNO ("Seller"), and is dated for reference purposes as of August 16, 2019.

(Doc. No. 28 at 21 (emphasis added).)  The APA further provides that "Buyer may assign its rights under this Agreement to an assignee entity wholly-owned by Manuel Prieto and Mona R. Llamas ('Assignee')."  (*Id.* at 36.)  In the FAC, plaintiffs allege that "[t]ogether, Llamas and Prieto own Prieto Auto" and that the assignee referenced in the APA was Prieto Automotive.  (*Id.* at ¶¶ 9, 42.)

It is reasonable to infer that HAG was aware that plaintiffs were entering into the APA for the benefit of Prieto Automotive, the entity through which plaintiffs operated their numerous automobile dealerships.  (*Id.* at ¶ 9.)  Though the APA does not name Prieto Automotive, it specifically contemplates an assignment to Prieto and Llamas's wholly owned company.  Haron's arguments on this point are unpersuasive and fail to consider that "[i]nsofar as intent to benefit a third person is important in determining his right to bring an action under a contract, it is sufficient that the promisor must have understood that the promisee had such intent." *Northstar Fin. Advs., Inc. v. Schwab Invs.*, 779 F.3d 1036, 1063 (9th Cir. 2015) (citing *Lucas v. Hamm*, 56 Cal. 2d 583, 364 P.2d 685, 689 (1961)).

For these reasons, the court concludes that Prieto Automotive is a third-party beneficiary under the APA.

> 2.     Whether Plaintiffs Had a Contractual Right to Purchase a Volvo Franchise

Haron argues that it did not interfere with plaintiffs' purchase of the Volvo dealership because the APA did not provide plaintiffs the right to purchase a Volvo franchise; HAG did not own the right to assign or transfer the Volvo franchise to a new owner because only Volvo held that right.  (*Id.* at 13–15.)  Haron points to numerous provisions in the APA, including a section making Volvo's approval of the transfer a condition precedent to plaintiffs' obligations under the agreement.  (*Id.* at 14–15.)  Haron further emphasizes that the APA is merely an agreement to transfer HAG's specifically defined assets and does not state that plaintiffs are purchasing from HAG the right to own and operate a Volvo franchise.  (*Id.* at 12–14.)

Plaintiffs argue that the right to acquire a Volvo franchise can be found in several provisions of the APA.  (Doc. No. 45 at 16–20.)  For example, plaintiffs note that they agreed to purchase the seller's "New Vehicles" and "Volvo parts and accessories," assets for which they would have little use if they had no right to purchase the dealership.  (*Id.* at 16.)  Plaintiffs also highlight the APA's recital defining HAG's business as a Volvo "Dealership" and providing that, "upon consummation of the transfer contemplated herein, Buyer will operate the Dealership." (*Id.* at 17.)  The FAC alleges that the "goodwill" for which plaintiffs contracted under the APA means the "blue-sky value" of the automobile dealership, which "reflects the intangible value of

18

1   operating a manufacturer's franchised store in a specific location."  (Doc. No. 28 at ¶ 52.)

2         Plaintiffs fail to state a claim against Haron for intentional interference with the APA.

3   The FAC does not allege that Haron interfered with HAG's performance of the APA.  Nor does it

4   allege that plaintiffs had any contractual agreement with Volvo or that Haron interfered with any

5   such contract with Volvo.  Rather, the FAC alleges that Haron caused Volvo, which is not a party

6   to the APA, to withhold consent to the transfer of the Volvo franchise to plaintiffs.  As pleaded,

7   that does not constitute intentional inference with the APA.

8         The APA states that it "shall be construed, enforced, and governed in accordance with the

9   laws of the State of California."  (Doc. No. 28 at 38.)  In California, franchise relations are

10   governed by the California Franchise Relations Act ("CFRA").  Cal. Bus. & Prof. Code § 20000

11   *et seq*.  "The provisions of [the CFRA] apply to any franchise when either the franchisee is

12   domiciled in this state or the franchised business is or has been operated in this state."  *Id.* at

13   § 20015.  With respect to the transfer of a franchise, the CFRA provides in relevant part that "[i]t

14   is unlawful for a franchisor to prevent a franchisee from selling or transferring a franchise . . . to

15   another person provided that the person is qualified under the franchisor's then-existing standards

16   for the approval of new or renewing franchisees."  *Id.* at § 20028(a).  Subdivision (b) of this

17   section provides that "[n]otwithstanding subdivision (a), a franchisee shall not have the right to

18   sell, transfer, or assign the franchise . . . without the written consent of the franchisor."  *Id.* at

19   § 20028(b).  "This section does not prohibit a franchisor from exercising the contractual right of

20   first refusal to purchase a franchise . . . after receipt of a bona fide offer from a proposed

21   purchaser to purchase the franchise, assets, or interest."  *Id.* at § 20028(c).

22         In this case, the provisions of the CFRA applied when HAG and plaintiffs executed the

23   APA because the Volvo franchise was operated in California.  (Doc. No. 28 at 21); Cal. Bus. &

24   Prof. Code § 20015.  Even assuming the APA was a proposed franchise transfer, the CFRA

25   supports Haron's position because it makes clear that a franchisee "shall not have the right to

26   sell" the franchise without the franchisor's written consent.  Cal. Bus. & Prof. Code § 20028(b).

27   Plaintiffs' argument that the APA provided them a contractual right to purchase the Volvo

28   franchise is unpersuasive as seller HAG did not have the corresponding right to sell the franchise.

1   The APA also contradicts plaintiffs' argument.  *See id.* § 5.4 at 26 (requiring consent from "the

2   manufacturer" i.e., defendant Volvo); *id.* §§ 8.4, 8.6 at 30 (making defendant Volvo's approval of

3   the transfer a condition precedent to plaintiffs' performance).

4          While HAG had the right to sell its business assets to plaintiffs as agreed in the APA, only

5   Volvo had the ultimate right to decide whether to authorize the transfer of the franchise rights to

6   plaintiffs or, instead, to exercise Volvo's right of first refusal.  (*See* Doc. No. 28 at ¶ 15.)

7   Plaintiffs were aware Volvo might not consent to plaintiffs acquiring the franchise rights, and the

8   APA provided plaintiffs relief from the obligation of having to purchase HAG's assets if—as

9   occurred here—Volvo withheld its consent.  (*Id.* ¶ 95.)

10         While the APA provided plaintiffs with a contractual right to purchase certain tangible

11  and intangible assets from HAG, plaintiffs' expectation of becoming Volvo franchisees was

12  merely potential, or prospective, and was subject to Volvo electing not to provide its consent.  *See*

13  Cal. Bus. & Prof. Code § 20028(b).  The FAC and the APA do not establish that plaintiffs had a

14  right to acquire the franchise from Volvo; rather, they plead at most that plaintiffs anticipated that

15  Volvo might approve the prospective franchise relationship.  The FAC recognizes that Volvo had

16  an independent right to decide whether to approve plaintiffs as franchisees and asserts that Volvo

17  never indicated any willingness to contract with plaintiffs, declined to consent to plaintiffs

18  becoming franchisees, and refused to act in good faith or to give any explanation beyond stating

19  that it had selected another franchisee.  (*Id.* ¶¶ 50, 87, 88.).

20         *SCEcorp v. Superior Court*, 3 Cal. App. 4th 673 (1992), and *Jewel Cos., Inc. v. Pay Less*

21  *Drug Stores Northwest, Inc.*, 741 F.2d 1555 (9th Cir. 1984), do not support plaintiffs' position.  In

22  *SCEcorp*, San Diego Gas & Electric Company ("SDG&E") and Tucson Electric Power Company

23  ("Tucson") entered into a merger agreement that was conditioned on regulatory approval.

24  *SCEcorp*, 3 Cal. App. 4th at 675.  Before the parties obtained regulatory approval, SCEcorp

25  allegedly interfered with the contract by making an unsolicited offer for SDG&E, acquiring

26  SDG&E shares, and inducing members of SDG&E's board of directors and management to

27  abandon the proposed merger with Tucson.  *Id.* at 675–76.  Tucson sued SCEcorp for intentional

28  and negligent interference with contract, and interference with prospective economic advantage.

1   *Id.* at 676.  In reviewing the trial court's order overruling SCEcorp's demurrer, the California

2   Court of Appeal held that the fact that the condition precedent of regulatory approval had not yet

3   been met did not preclude Tucson as a matter of law from asserting a claim that the defendant

4   tortiously interfered with its contractual relations with SDG&E.  *Id.* at 683.

5        In *Jewel Cos.*, Pay Less Drug Stores ("Pay Less") entered into a binding merger

6   agreement with Jewel Companies, Inc. ("Jewel") subject to several prerequisites, including Pay

7   Less obtaining shareholder approval.  *Jewel Cos.*, 741 F.2d at 1557–58.  Pay Less Drug Stores

8   Northwest, Inc., ("Northwest") submitted a competing tender offer to acquire Pay Less, which

9   Jewel alleged caused Pay Less to break off the merger without having sought shareholder

10  approval – a condition precedent for the merger.  Jewel alleged Northwest tortiously interfered

11  with its contract with Pay Less.  *Id.* at 1558.  The Ninth Circuit reversed summary judgment for

12  Northwest and found that Jewel could proceed on its claim of tortious interference with contract.

13       In both cases, the allegedly interfering defendant directly induced the plaintiff's

14  contractual counterparty to abandon its contract with the plaintiff.  *See SCEcorp*, 3 Cal. App. 4th

15  at 676; *Jewel Cos.*, 741 F.2d at 1558–59.  In contrast, here plaintiffs do not allege any contractual

16  agreement with Volvo; plaintiffs' agreement under the APA was with HAG.  And the FAC does

17  not allege that Haron induced HAG to breach or otherwise break off the contract.  Instead,

18  plaintiffs allege that Haron presented itself to Volvo as an alternative franchisee, thereby causing

19  Volvo to decline to consent to plaintiffs acquiring the franchise.  Plaintiffs allege that defendant

20  Haron convinced defendant Volvo not to consent to the transfer of the franchise, not that

21  defendant Haron convinced plaintiffs' contractual counterparty HAG to breach the APA.  (Doc.

22  No. 28 at ¶ 95.)

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1       Moreover, Volvo's consent to the franchise transfer was a condition precedent to

2 *plaintiffs'* obligation to proceed under the APA, not to the obligations of HAG, the seller.[7]  The

3 FAC and the APA reflect that plaintiffs could have elected to proceed with the agreement to

4 purchase HAG's assets even without Volvo's consent.  Plaintiffs may have expected to become

5 Volvo franchisees, but they structured the APA so they could elect *not* to proceed with the APA if

6 Volvo declined to offer them the franchise.  And that is what plaintiffs did.  While plaintiffs

7 understandably did not go forward with the APA when Volvo withheld its consent to the transfer

8 of the franchise, it was plaintiffs who chose not to proceed under the APA, not their contracting

9 party.

10       The FAC does not allege that HAG broke off the contract or failed to carry out its

11 obligations under the APA.  Plaintiffs submitted the APA to Volvo to attempt to obtain Volvo's

12 consent, which would have fulfilled the condition precedent.  Plaintiffs do not claim that Haron

13 interfered with HAG's performance of the contract; rather, plaintiffs claim that Haron presented

14 itself to Volvo as an alternate franchisee, which led Volvo to select Haron over plaintiffs.  While

15 the FAC alleges that Volvo declined its consent, Volvo had the right to do so provided it acted for

16 a non-discriminatory reason.  Plaintiffs had no contractual right to require Volvo to allow them to

17 become franchisees.

18       In contrast, in *SCEcorp* and *Jewel Cos.* the defendants also caused the other contracting

19 party to break off the contract before pursuing the approval that constituted the condition

20 precedent.  In *SCEcorp*, when the other contracting party broke off the contract, regulatory

21 approval had not yet been "fully pursue[d]."  *SCEcorp*, 3 Cal. App. 4th at 676.  In *Jewel*, the other

22 contracting party withdrew the request for a shareholders' meeting before the shareholder vote.

23

---

24 [7]  The APA provides that plaintiffs could terminate the APA "based upon a failure of a condition
precedent" such as Volvo's withholding of its consent.  (Doc. No. 28 at 33.)  In this respect,
25 plaintiffs' expectation with respect to Volvo is analogous to the expectation it would have with
respect to an at-will employee of a business it was acquiring.  Plaintiffs had at most an
26 *expectation* of potential future contractual relations.  *Ixchel Pharma, LLC*, 9 Cal. 5th at 1147.  In
the same way that "parties to at-will contracts have no legal assurance of future economic
27 relations," the APA reflects plaintiffs' understanding that they had no legal assurance that the
condition precedent of Volvo's approval would be satisfied.  *Id.* at 1147.

28

1   *Jewel*, 741 F.2d at 1559.  In those cases, a third party caused the plaintiff's contracting partner to

2   break off the contract and not seek to fulfill the condition precedent.  In that context, the fact that

3   the condition precedent remained unfulfilled did not preclude the plaintiffs' claims against the

4   third party for interfering with their contractual relations.

5           For these reasons, the court concludes that plaintiffs have failed to plausibly allege that

6   Haron interfered with their contractual relationship with HAG under the APA.

7               3.      Whether Plaintiffs Have Adequately Pled Causation

8           "California employs the 'substantial factor' test for determining causation in intentional

9   torts cases."  *Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008) (citing

10  *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 391 (2004)).  "Although a force which

11  plays only an infinitesimal or theoretical part in bringing about injury, damage, or loss is not a

12  substantial factor, the substantial factor test is a broader rule of causality than the but for test."  *Id.*

13  (internal quotation marks and citation omitted).  "In the context of a cause of action for inducing

14  interference with contractual relations, some courts have stated that causation exists where the

15  plaintiff can show the contract would have been performed in the absence of the defendant's

16  alleged inducements."  *Jenni Rivera Enterprises, LLC v. Latin World Ent. Holdings, Inc.*, 36 Cal.

17  App. 5th 766, 792 (2019) (citing *Hahn v. Diaz-Barba*, 194 Cal. App. 4th 1177, 1196 (2011)); *see*

18  *also* 5 Witkin, Summary 11th Torts § 850 (2024) ("It must be alleged and proved that the

19  defendant's act caused the breach, i.e., that otherwise the contract would have been performed.").

20          The FAC alleges that "[a]ttorney Aaron was leaking information about the ongoing

21  negotiations to Haron, allowing it to swoop in as a suitable, white-owned alternative for Volvo to

22  contract with instead of Plaintiffs."  (Doc. No. 28 at ¶ 12.)  The FAC also alleges that "[b]ecause

23  of Aaron, Haron knew about Plaintiff's APA and intentionally sought to—and did—interfere with

24  and disrupt the APA, so that it could acquire the Dealership for itself, thereby damaging

25  Plaintiffs."  (*Id.* at ¶ 76.)  The FAC further alleges that "[a]fter refusing to allow the sale of the

26  Dealership to Plaintiffs, Volvo approved a sale of the Dealership to a white-owned company,

27  Haron."  (*Id.* at ¶ 57.)

28          Even when viewed in the light most favorable to plaintiffs and drawing all reasonable

inferences in their favor, these allegations, along with others in the FAC, are insufficient to allege that defendant Haron interfered with HAG's performance under the APA.  The allegation that defendant Haron "swoop[ed] in" and "present[ed] itself" to defendant Volvo as an alternate franchisee is insufficient.  (Doc. No. 28 at ¶ 24.)  Furthermore, plaintiffs do not plausibly allege that Volvo would have consented to the transfer of the franchise to plaintiffs in the absence of Haron proposing itself to Volvo as potential franchisee.  *Jenni Rivera*, 36 Cal. App. 5th at 792.  Volvo exercised its right of first refusal and acquired the franchise from HAG rather than allow the franchise to be transferred to plaintiffs.  Plaintiffs allege that Volvo did so for racially discriminatory reasons.  The FAC does not allege any specific facts to show that Volvo would have allowed the franchise to go to plaintiffs if Haron had not offered itself as a potential franchisee.

The cases cited by plaintiffs for the proposition that they have met the minimal showing required at the pleadings stage are distinguishable.[8]  In *Aversan USA, Inc. v. Jones*, the defendant was alleged to have "encouraged and convinced" a third party to terminate its lease with the plaintiff.  No. 2:09-cv-00132MCEKJM, 2009 WL 1810010, at *3 (E.D. Cal. June 24, 2009).  In contrast, while plaintiffs allege that defendant Haron "swoop[ed] in" and "present[ed] itself" to defendant Volvo as a potential alternate franchisee, they do not allege any conduct by Haron to persuade HAG not to proceed with the APA.  Nor do they allege that HAG broke off the contract.  Rather, *plaintiffs* declined to proceed under the APA when Volvo did not approve them as franchisees.  Plaintiffs have therefore failed to plausibly allege that Haron's actions caused a

---

[8]  In *Welk Resort Grp. Inc. v. Reed Hein & Assocs., LLC*, the plaintiffs, who operated a timeshare program, alleged that the defendant company advertised to potential clients the desirability of dissolving their timeshare contracts with the plaintiffs and showed them a chart to that effect.  No. 3:17-cv-01499-L-AGS, 2019 WL 1242446, at *1 (S.D. Cal. Mar. 18, 2019).  The factual allegations in that case regarding the defendant's alleged interference are pleaded with greater specificity than plaintiffs' allegations here.  Plaintiffs' reliance on *Allen v. Powell,* 248 Cal. App. 2d 502 (Ct. App. 1967) is also unpersuasive.  That case predates *Iqbal* and *Twombly*, and the single allegation evaluated to establish causation—"as a result of said tortious interference by defendant Lee Bros., plaintiffs have been damaged in the amount of [$60,000]"—appears conclusory under federal pleading standards.  *Don King Prods./Kingvision v. Lovato*, 911 F. Supp. 419, 423 (N.D. Cal. 1995), similarly applied a pre-*Iqbal* and *Twombly* pleading standard, and it did not discuss any allegations relating to causation.

breach of their contractual relations under the APA.

In conclusion, plaintiffs fail to state a plausible claim against defendant Haron for intentional interference with plaintiffs' contractual relationship under the APA. The court grants defendant Haron's motion to dismiss, with leave to amend. *Unified Data Servs., LLC v. Fed. Trade Comm'n*, 39 F.4th 1200, 1208 (9th Cir. 2022) (noting leave to amend should be given if amendment could cure pleading defect).

## CONCLUSION

For the reasons explained above:

1.   Defendant Volvo's motion to dismiss (Doc. No. 41) is granted;

2.   Defendant Haron's motion to dismiss (Doc. No. 36) is granted;

3.   Plaintiffs' first amended complaint (Doc. No. 28) is dismissed with leave to amend; and

4.   Plaintiffs may file a second amended complaint within 21 days of the date of this order. If plaintiffs fail to file a timely amended complaint, the court will dismiss the claims with prejudice and enter judgment for defendants.

IT IS SO ORDERED.

Dated:   June 13, 2024

_____
UNITED STATES DISTRICT JUDGE